UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CARMEN DONELSON and DOUGLAS DONELSON, wife and husband,<br><br>           Plaintiffs,<br><br>     vs.<br><br>PROVIDENCE HEALTH & SERVICES - WASHINGTON d/b/a PROVIDENCE HEALTH CARE and d/b/a ST. JOSEPH CARE CENTER,<br><br>           Defendant. | CV-10-157-EFS<br><br>**ORDER GRANTING IN PART, DENYING IN PART, AND HOLDING IN ABEYANCE IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS, DANIEL MCKINNEY** |

**INTRODUCTION**

Plaintiffs Carmen and Douglas Donelson (collectively, "Plaintiffs") filed this action on May 18, 2010, alleging that Mrs. Donelson was terminated from her nursing position with St. Joseph Care Center (SJCC) in violation of the Washington Law Against Discrimination (WLAD), the Americans with Disabilities Act (ADA), and section 504 of the Rehabilitation Act, and alleging a common law cause of action for wrongful termination in violation of public policy. Plaintiffs further allege that Defendant's conduct caused Mr. Donelson to suffer loss of consortium.

ORDER ~ 1

Before the Court are two defense motions: Defendant's Motion for Summary Judgment, ECF No. 18, and Defendant's Motion to Exclude Plaintiffs' Expert Witness, Daniel McKinney, ECF No. 14.  For the reasons discussed below, the Court grants in part, denies in part, and holds in abeyance in part Defendant's Motion for Summary Judgment, and grants Defendant's Motion to Exclude Plaintiffs' Expert Witness.

**DISCUSSION**

**I.   PHS's Motion for Summary Judgment**

    **A.   Factual Background**[1]

SJCC is a non-profit skilled nursing facility providing 24-hour nursing and rehabilitation care at its 162-bed facility.  SJCC offers services to patients who choose to live their remaining days at a skilled nursing facility, as well as to patients who need short-term assistance to recover from illness, surgery, or hospitalization.  SJCC is a subsidiary of Defendant Providence Health & Services (PHS), a health care ministry of the Catholic Church sponsored by the Vatican.  SJCC adheres to Providence's religious mission and purpose, providing spiritual and

---

[1] In connection with Defendant's motion, the parties submitted a Joint Statement of Undisputed Facts.  ECF No. 38.  The Court treats these facts as established consistent with Federal Rule of Civil Procedure 56(d), and sets these forth in this "Factual Background" section without reference to an ECF number.  Any facts supported by a citation to the record are disputed and are presented in the light most favorable to Plaintiffs.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

ORDER ~ 2

pastoral care services to its residents, employing a chaplain, and offering weekly religious services. SJCC's logo includes a cross. SJCC employees are not required to be Catholic or to participate in religious services, and SJCC provides care to patients of any faith or religious belief. SJCC strives to provide continuous care by having its caregivers develop an understanding of their resident's specific health care needs.

Plaintiff Carmen Donelson received her certification as a Nursing Assistant Certified (NAC) in 2002, and worked at several different facilities until she was hired for a full-time position at SJCC in March of 2009. Ms. Donelson worked as both a NAC and as a bath aide while employed at SJCC. Her job duties included assisting residents with their personal care, feeding, and transportation, as well as providing specialized care for patients in regard to their daily baths. Consistent with SJCC's policies for new employees, Ms. Donelson was subject to a ninety-day probationary period upon commencing her employment. SJCC's probation and medical leave policies provide that employees are not entitled to leave until they have completed their full probationary period.

On June 4, 2009, five days before the end of her probationary period, Ms. Donelson jammed her finger on a wheelchair while assisting a resident into a bath chair. After her finger became red, swollen, and painful the next day, Ms. Donelson went to the emergency room, where she was told she had sprained her finger. Ms. Donelson provided immediate notice of her injury to SJCC and initiated a worker's compensation claim. On June 10, 2009, Ms. Donelson submitted to SJCC a note from her doctor

indicating that she would be unable to return to work until June 17, 2009.

On June 11, 2009, SJCC sent Ms. Donelson a letter informing her that she was not eligible for FMLA.  Though SJCC's policies provide that employees are not entitled to leave until they have completed their full probationary period, SJCC placed Ms. Donelson on an unpaid six-week leave.  The condition of Ms. Donelson's finger worsened over the next several weeks, and Ms. Donelson contracted MRSA (methicillin-resistant staphylococcus aureus), a dangerous antibiotic-resistant bacterial infection.  Ms. Donelson's finger was subsequently amputated up to the first joint in late June 2009.

During the course of Ms. Donelson's unpaid leave, she submitted several additional letters from her treating physicians to SJCC.  On June 15, 2009, June 22, 2009, and July 1, 2009, Ms. Donelson's orthopedic surgeon submitted notes to SJCC stating that she would be unable to return to work until further notice.  On July 2, 2009, Ms. Donelson's surgeon submitted a note stating that "[Ms. Donelson] has developed osteomyelitis of right index finger.  Surgery is planned and she will need 6 weeks of antibiotics/wound care.  She will be unable to return to work due to the infection until she is finished with this treatment." As of July 20, 2009, Ms. Donelson had exhausted her six weeks of unpaid medical leave, and her doctors had not provided her with a definite return to work date.

Ms. Donelson was terminated from SJCC on July 20, 2009.  SJCC's termination letter stated that "if [Ms. Donelson was] rehired within one year reinstatement is available."  Ms. Donelson continued to receive

medical treatment and engage in therapy until she was released to return to work on October 20, 2009.

Sometime after Ms. Donelson received clearance to return to work, her worker's compensation case manager left a message stating that SJCC would "love to have [her] come back." Ms. Donelson received the message but never returned the call, being unwilling to return to SJCC because she believed that she was terminated because of her injury. Ms. Donelson obtained other employment in November 2009, roughly two weeks after being released to work.

Plaintiffs filed this action on May 18, 2010, seeking general damages, special damages for lost wages, loss of future earnings and lost earning capacity, punitive damages under 43 U.S.C. § 1981a, and loss of consortium damages on behalf of Mr. Donelson. PHS now moves for summary judgment on all of Plaintiffs' claims.

**B.    Summary Judgment Standard**

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a party has moved for summary judgment, the opposing party must point to specific facts establishing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). If the nonmoving party fails to make such a showing for any of the elements essential to its case for which it bears the burden of proof, the trial court should grant the summary judgment motion. *Id.* at 322. "When the moving party has carried its burden of [showing that it is entitled to judgment as a

matter of law], its opponent must do more than show that there is some metaphysical doubt as to material facts.  In the language of [Rule 56], the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (internal citation omitted) (emphasis in original).

When considering a motion for summary judgment, the Court does not weigh the evidence or assess credibility; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255.  This does not mean that a court will accept as true assertions made by the non-moving party that are flatly contradicted by the record.  *See Scott v. Harris,* 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

### C.   Ms. Donelson's Washington Law Against Discrimination Claim

PHS asserts that Ms. Donelson's WLAD claim must be dismissed because PHS falls within the law's exemption for religious organizations. Plaintiffs counter that: 1) PHS should be equitably estopped from asserting its exempt status; 2) PHS does not fall within the exemption; and 3) the WLAD's exemption for religious organizations violates Article I, Section XI of the Washington Constitution.

#### 1.   Estoppel Argument

Plaintiffs assert that PHS should be estopped from asserting that it is exempt under the WLAD's religious exemption because statements in

PHS's Equal Employment Opportunity (EEO) policy, given to new employees upon hire, state that PHS will not discriminate on the basis of disability.[2]

Under Washington law, a party asserting equitable estoppel must demonstrate 1) an admission, statement, or act inconsistent with the claim afterwards asserted, 2) action by the other party on the faith of such admission, statement, or act, and 3) injury to such other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act. *Farnam v. CRISTA Ministries*, 116 Wn.2d 659, 678-79 (1991) (en banc) (citing *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 340 (1989)). "Estoppel focuses on the justified reliance of the person asserting it." *Id.* at 679. Justifiable reliance is defined by Washington courts as reliance that was "reasonable under the circumstances." *ESCA Corp. v. KPMG Peat Marwick*, 135 Wn.2d 820, 828 (1998) (en banc).

For PHS to be estopped from asserting that it is covered by the WLAD's religious exemption, Plaintiffs must show that the statement in SJCC's EEO policy is inconsistent with asserting exemption from the WLAD, that Ms. Donelson justifiably relied on the policy, and that Ms. Donelson would be injured by PHS's exemption. Only the first two of these prongs are at issue.

### i.   Inconsistency with Claim

In *Farnam*, the Supreme Court of Washington held that a religious organization was not estopped from asserting its exemption under the WLAD

---

[2] The EEO policy at issue was promulgated by SJCC, Plaintiff's former employer and a subsidiary of Defendant PHS.

ORDER ~ 7

because it "at all times held itself out to [the plaintiff] as a religious organization and never represented to her that it would not assert the exemption." *Farnam*, 116 Wn.2d at 679.  Whether SJCC's EEO policy is inconsistent with PHS's assertion of exemption from the WLAD thus turns on whether the statement is construed as a representation that PHS would not assert the exemption.  The EEO policy states in pertinent part:

> St. Joseph Care Center does not discriminate in employment opportunities or practices on the basis of race, color, religion, sex, national origin, sexual orientation, age, disability, or any other characteristic protected by law.

Crane Decl., ECF No. 22 Ex. 15 at 78.

A similar issue arose recently in *French v. Providence Everett Medical Center*, 2008 U.S. Dist. LEXIS 80125, Case No. C07-0217-RSL (W.D. Wash. 2008).  The employment policy at issue in *French* stated:

> [The Defendant] supports the principles of equal employment opportunity and will not discriminate with respect to race, color, religion, sex, national origin, age, creed, the presence of a disability, marital or veteran's status, or any other basis prohibited by local, state, or federal laws in any aspect of its employment or pre-employment practices.

*French*, 2008 U.S. Dist. LEXIS 80125, at *24-25.  The court in *French* held that this language estopped the defendant from asserting its exemption from the WLAD because "the statement [was] not qualified by 'as applicable.'" *Id.* at *25.  Plaintiffs assert that this reasoning should inform the Court's decision, notwithstanding the somewhat broader language of the policy at issue in *French*.

The SJCC's EEO policy is not *per se* inconsistent with PHS's assertion of exemption status under the WLAD; the policy does not explicitly represent that SJCC agrees to be subject to the WLAD, and a

ORDER ~ 8

pledge not to *discriminate* is not necessarily inconsistent with a later claim of *exemption* from the WLAD.  While SJCC's stated policy of non-discrimination is difficult to reconcile with the later assertion of an exemption that essentially gives SJCC license to discriminate, in light of the narrow standard set forth in *Farnam*, the Court finds that Plaintiffs have not shown that the EEO policy is inconsistent with PHS's assertion of exemption from the WLAD.

### ii. Justifiable Reliance

The parties also dispute whether Ms. Donelson justifiably relied on the SJCC's EEO policy.  PHS argues that Ms. Donelson did not rely on the pledge because she stated during her deposition that she neither discussed the policy with anyone at SJCC nor made any decisions based on the policy.  *See* Donelson Dep., 34:20-35:17, 87:17-87:19, ECF No. 31 Ex. 6 at 8, 20.  Ms. Donelson counters that these two admissions do not negate her reliance, and asserts that she "would not have accepted a position or worked for an employer who did not have an EEO policy and abide by it in spirit and practice."  ECF No. 29 at 4.

Even viewing the presented evidence in the light most favorable to Ms. Donelson, the Court cannot reasonably conclude that she justifiably relied on the EEO policy.  Plaintiff has not identified any specific action that she took or deferred as a result of the policy, and has admitted in her sworn testimony that she did not base any decisions on the policy.  The Court thus finds that Ms. Donelson has not met her burden of showing that she justifiably relied on the policy.

1    Because Ms. Donelson has failed to carry her burden on the first two
2    estoppel factors, the Court finds that PHS is not estopped from asserting
3    its exempt status under the WLAD.

4              **2.   The WLAD's Religious Exemption**

5    The WLAD's religious exemption is found in the statute's definition
6    of "employer," which excludes "any religious or sectarian organization
7    not organized for private profit."   R.C.W. 49.60.040(11).

8    The Washington State Court of Appeals has noted in a case involving
9    another subsidiary of PHS that PHS's parent organization, Sisters of
10   Providence, is a religious organization for purposes of the WLAD's
11   religious exemption.   *See Harris v. Providence Everett Medical Center*,
12   161 Wn. App. 1039, 2011 WL 1843450 at *3 (May 16, 2011) (unpublished
13   opinion).   The court in *Harris* declined to reach the question of whether
14   a parent organization's status applies to facilities it operates,
15   however, because it was not raised at the trial court level.   *See id.*
16   (noting that "[i]t appears that under *Farnam*, [the fact that the
17   defendant was wholly owned by the Sisters of Providence] would render
18   [the defendant] exempt from the statute.").   After careful examination
19   of *Farnam*, the Court concludes that as the Washington Supreme Court
20   interprets the WLAD, a parent organization's religious status applies to
21   facilities it operates.   *See Farnam*, 116 Wn.2d at 674.   The question is
22   thus whether PHS or its parent organization, Sisters of Providence, is
23   a "religious organization" under the WLAD.

24   What constitutes a religious organization is not defined in the
25   WLAD, and has only been explored in two Washington cases.   While PHS
26   argues that these cases establish a three-part disjunctive test for

ORDER ~ 10

religious organizations, case law instead directs Courts to examine the "entire factual context of the case, including the stated purpose of the [organization]." *Farnam*, 116 Wn.2d at 677.

The first case to address the scope of the religious exemption, *Hazen v. Catholic Credit Union*, involved a financial institution that had been founded by a group of Catholic laymen. *Hazen v. Catholic Credit Union*, 37 Wn. App. 502, 503-04 (1984). In finding that the religious exemption did not apply to the credit union, the court in *Hazen* noted that the credit union had no organizational ties to the Catholic Church, that its bylaws stated a secular purpose of promoting thrift, and that membership was not limited to Catholics. *Id.* at 504. Furthermore, employees were hired on the basis of ability, and not religious devotion, and no member of the Catholic clergy had served on its board of directors. *Id.* Citing several dictionaries for the plain meaning of the term "religion," the court in *Hazen* concluded that the defendant credit union's actions did not represent "manifestations of devotion to a superior being." *Id.* at 506.

The Supreme Court of Washington addressed the religious exemption seven years later in *Farnam v. CRISTA Ministries*, 116 Wn.2d 659 (1991). After an extended discussion of *Hazen*, the court in *Farnam* examined institutional documents such as the defendant's articles of incorporation, corporate bylaws, staff information manual, and nursing staff mission statement. *Farnam*, 116 Wn.2d at 677-78. In holding that the defendant was a religious organization under the WLAD, the court in *Farnam* noted that the defendant required its employees to sign a doctrinal statement, that the defendant began most days with prayers, and

1  that the defendant offered vesper services and had two chaplains on its
2  staff.  *Id.* at 678.

3       Applying this broad factual inquiry to the uncontroverted evidence
4  before the Court, it is clear that both Defendant PHS and its subsidiary
5  SJCC fall within the meaning of a "religious organization" under the
6  WLAD.  Defendant's mission statement includes "continu[ing] the healing
7  ministry of Jesus in the world of today with special concern for those
8  who are poor and vulnerable."  Crane Decl., ECF No. 22 Ex. 1 at 2.
9  Defendant's articles of incorporation include among its purposes "any and
10 all other things . . . which are consistent with . . . the teachings and
11 laws of the Roman Catholic Church."  *Id.* Ex. 2 at 1.  PHS employs a
12 chaplain, allows volunteer nuns to work with residents, and offers weekly
13 religious services.  ECF No. 38 ¶ 5.  Most importantly, Defendant is "a
14 health care ministry of the Catholic Church sponsored by the Vatican."
15 *Id.* ¶ 3.  This direct hierarchical connection with an organized religious
16 entity was lacking in both *Hazen* and *Farmer*, and is a strong indication
17 that Defendant is a "religious organization" under the WLAD.

18      Based on the uncontroverted evidence, the Court finds that PHS is
19 a religious organization under the WLAD, and that the WLAD's religious
20 exemption applies to PHS.

21          **3.   Constitutionality of the WLAD's Religious Exemption**

22      Ms. Donelson asserts that the WLAD's religious exemption violates
23 Article I, Section 11 of the Washington Constitution when it is applied
24 to discrimination on grounds other than religion.  Specifically, Ms.
25 Donelson argues that the exemption violates Section 11's anti-
26 establishment principle because it grants religious organizations broad

ORDER ~ 12

license to discriminate on grounds such as disability, gender, and race, thereby improperly favoring religion over non-religion.

While Ms. Donelson challenges the religious exemption under Section 11, her memorandum cites only federal cases interpreting the First Amendment to the United States Constitution.   Defendant cites several cases in support of the proposition that the WLAD's religious exemption has been "upheld," but each case either involved a challenge under a different constitutional provision, or the court did not reach the Section 11 argument.   *See MacDonald v. Grace Church Seattle*, 457 F.3d 1079, 1080 (9th Cir. 2006) (declining to reach federal constitutional arguments); *Erdman v. Chapel Hill Presbyterian Church*, 156 Wn. App. 827, 848-50 (2010) (rejecting Fourteenth Amendment Equal Protection challenge and not reaching state Privileges and Immunities argument); *Farnam*, 116 Wn.2d at 679 (declining to reach Section 11 argument).

Article I, Section XI of the Washington State Constitution provides in pertinent part:

> Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state. No public money or property shall be appropriated for or applied to any religious worship, exercise or instruction, or the support of any religious establishment.

Wash. Const. Art I, § 11 (amended 1993).

The United States Supreme Court has noted that Section 11 is "far stricter" than the Establishment Clause of the First Amendment to the United States Constitution.   *Witters v. Wash. Dep't of Servs. for the Blind*, 474 U.S. 481, 489 (1986) (citing *Witters v. Comm'n for the Blind*,

ORDER ~ 13

102 Wn.2d 624, 625 (1984) ("*Witters I*")).  When the state appropriates or provides money or property for religious purposes, Washington courts apply the plain language of Section 11 as an "absolute" bar.  *Witters v. State Comm'n for the Blind*, 112 Wn.2d 363, 368-69 (1989) ("*Witters II*").  With regard to claims not involving the appropriation of public money or property for religious purposes, however, the proper Section 11 analysis appears to be an open question.  *See Maylon v. Pierce Cnty.*, 79 Wn. App. 452, 466-67 (1997) (analyzing chaplaincy clause of Section 11 under *State v. Gunwall* because "even when the court has used the *Gunwall* factors to analyze a provision of the state constitution and has determined that an independent [analysis is required], under a different context a new *Gunwall* analysis is required."); *see also Weiss v. Bruno*, 82 Wn.2d 199, 215-17 (1973) (applying *Lemon v. Kurtzer* analysis); *State Dept. of Labor & Indus. v. Wendt*, 47 Wn. App. 427, 432 (1987) (stating during the interim between *Witters I* and *Witters II*, "[i]n determining whether a state statute impermissibly establishes religion under article 1, section 11 of our constitution, our Supreme Court has adopted the [*Lemon v. Kurtzer*] 3-prong test developed by the United States Supreme Court in making the identical determination under the first amendment to the United States Constitution." (citing *Weiss*, 82 Wn.2d at 215-17)).  The Court's research has not uncovered any Washington Supreme Court cases since *Witters II* was decided that have analyzed a Section 11 challenge to a statute of general applicability.

Because PHS's assertion of the WLAD exemption in a case involving discrimination on grounds other than religion appears to raise a novel and important question of state law, the Court is considering certifying

ORDER ~ 14

this question to the Supreme Court of Washington pursuant to RCW 2.60.020. Doing so would afford the Washington Supreme Court an opportunity to rule on an issue of state constitutional law, as well as eliminate the possibility that the Court would rely on a speculative or erroneous interpretation of Section 11 in ruling on PHS's motion. *See Kremen v. Cohen,* 325 F.3d 1035, 1037 (9th Cir. 2003) ("The certification procedure is reserved for state law questions that present significant issues, including those with important public policy ramifications, and that have not yet been resolved by the state courts.").

As such, the parties shall file a notice with the Court stating their positions regarding whether the Court should certify this issue to the Supreme Court of Washington by October 28, 2011. A party that *requests* certification shall include in its memorandum a proposed question for the Court to certify. A party that *opposes* certification shall file their response to the other party's proposed certified question, if any, no later than November 4, 2011.

The Court understands that compliance with this deadline may interfere with counsel's trial preparation, and is also cognizant of the burdens that further delay of trial may place upon the parties and their counsel. However, because this issue has been affirmatively raised, and may be dispositive of one of Ms. Donelson's claims, the Court finds this to be a necessary step. If the Court does certify a question to the Supreme Court of Washington on this issue, the November 14, 2011 trial date will be stricken.

On this last point, the Court notes that due to conflicts with its criminal trial schedule, the trial date in this matter is likely to be

stricken regardless of whether the Court certifies a question to the Supreme Court of Washington.   The Court has a criminal jury trial beginning on Thursday, November 10, 2011, and even if that trial is not held, the Court currently has *nine* separate criminal jury trials set to begin on November 14, 2011; if any one of those cases goes to trial, the trial date in this case will be stricken.

Accordingly, the Court holds PHS's motion in abeyance with regard to Ms. Donelson's WLAD claim.

### D.   Ms. Donelson's Americans with Disabilities Act Claim

Ms. Donelson also alleges that Defendant violated her rights under the ADA when it failed to accommodate her disability and terminated her as a result of her disability.[3]

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability."   42 U.S.C. § 12112(a).   A prima facie claim for discrimination under the ADA thus requires showing that 1) the individual is a disabled person within the meaning of the ADA, 2) the individual is a qualified individual, and 3) the employer terminated the individual because of their disability.

---

[3]   In her responsive memorandum, Ms. Donelson appears to assert for the first time a claim for retaliation.   ECF No. 29 at 19.   Ms. Donelson does not indicate whether this claim is based on the WLAD or the ADA, and cites both state and federal precedent in support of her argument. Because Ms. Donelson's complaint did not allege a cause of action for retaliation, and Ms. Donelson has not been given leave to amend her complaint, the Court does not consider this claim.

ORDER ~ 16

*Kennedy v. Applause*, 90 F.3d 1477, 1481 (9th Cir. 1996) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995)).  The parties do not dispute that Ms. Donelson was disabled under the ADA.  Instead, PHS argues that 1) Ms. Donelson was not a "qualified individual" under the ADA, and alternatively, 2) SJCC's six-week unpaid medical leave was a reasonable accommodation under the ADA.

### 1. Qualified Individual

A "qualified individual" is defined in the ADA as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  PHS argues that Ms. Donelson was not a qualified individual under the ADA at the time of her termination because she was unable to perform the essential functions of her position including, among other things, pushing a wheelchair.  This argument is based on a flawed reading of the definition of "qualified individual."

*Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243 (9th Cir. 1999), provides an instructive example.  The plaintiff in *Nunes* was employed as a sales associate at Wal-Mart when she began to suffer stress-related "syncopal episodes" that caused her to faint.  *Nunes*, 164 F.3d at 1245. Ms. Nunes began an extended medical leave for diagnosis and treatment of her condition, and provided her employer with several letters from her treating physicians that documented her illness.  *Id.* at 1245-46.  After almost six months of medical leave, Ms. Nunes was terminated.  *Id.*  Ms. Nunes filed suit and her former employer moved for summary judgment.  *Id.* at 1246.

1    The district court granted the Wal-Mart summary judgment on the
2    issue of whether Ms. Nunes was a qualified individual on the ground that
3    she could not perform the essential functions of her position on the date
4    she was terminated.  *Id.* at 1246-47.  The Ninth Circuit reversed on the
5    grounds that the district court misapplied the ADA's qualified individual
6    standard.  *Id.* at 1247.  Because the ADA requires individuals to be able
7    to perform essential job functions "with or without reasonable
8    accommodation," and because unpaid medical leave may be a reasonable
9    accommodation under the ADA, the Ninth Circuit held that "[i]f Nunes's
10   medical leave was a reasonable accommodation, then her inability to work
11   during the leave period would not automatically render her unqualified."
12   *Id.*  The logic behind the Ninth Circuit's holding is pellucid: if an
13   employee's ability to perform essential job functions were evaluated
14   solely with regard to the period of time during which they were on
15   medical leave, no employee that was forced by disability to take medical
16   leave could *ever* be a "qualified individual" under the ADA.

17   PHS has devoted its briefing to demonstrating that Ms. Donelson was
18   unable to perform the essential functions of her job during the time that
19   she was on medical leave.  The pertinent question, however, is whether
20   Ms. Donelson was able to perform the essential functions of her job *with*
21   *or without reasonable accommodation*.  Because it is undisputed that Ms.
22   Donelson was able to perform the functions of a NAC both before and after
23   she returned from medical leave, Ms. Donelson is a "qualified individual"
24   under the ADA and PHS's motion turns on whether Plaintiff's medical leave
25   was a reasonable accommodation.

26

**2.    Reasonable Accommodation**

"Reasonable accommodation" is defined, as is relevant here, as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position."  29 C.F.R. § 1630.2(o)(1)(ii) (2011).  Employers covered by the ADA are "required, absent undue hardship, to provide a reasonable accommodation to an otherwise qualified individual."  *Id.* at § 1630.2(o)(4).  "Undue hardship" is defined as "an action requiring significant difficulty or expense."  *See* 42 U.S.C. § 12111(10)(A).  Determining whether an accommodation would involve undue hardship requires an examination of the nature and cost of the accommodation, the overall impact of the accommodation on the facility, the overall impact of the accommodation on the covered entity, and the type of operation of the covered entity, including the composition, structure, and functions of the entity's workforce.  *Id.* at § 12111(10)(B).

Determining whether a proposed accommodation is reasonable, including whether it imposes an undue hardship on the employer, requires a "fact-specific, individualized inquiry."  *Nunes*, 164 F.3d at 1247.  "In the summary judgment context, a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation."  *Id.* (citing *Barnett v. U.S. Air, Inc.*, 157 F.3d 744, 752 (9th Cir. 1998)); *see also Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997).

ORDER ~ 19

Here, PHS submitted material evidence showing that SJCC's accommodation of Ms. Donelson's disability was reasonable: SJCC gave Ms. Donelson six weeks of unpaid medical leave even though she was still in her probationary period; SJCC offered Ms. Donelson reinstatement with all benefits relating back to her date of hire if she returned within one year; and SJCC contacted Ms. Donelson to offer her open positions once she was cleared to return to work (albeit after she had been terminated). PHS has also shown that Ms. Donelson's extended leave caused SJCC hardship by interfering with its goal of providing its residents with continuous and consistent care. On the other hand, Ms. Donelson counters that her unpaid medical leave caused no financial harm to SJCC, and that PHS's continuity argument lacks merit because SJCC often filled the NAC position with temporary employees.

In light of this conflicting evidence and fact-specific nature of the question presented, the Court finds that material factual issues exist with regard to whether Ms. Donelson's medical leave was a "reasonable accommodation" under the ADA. Accordingly, the Court denies PHS's motion with regard to Ms. Donelson's ADA claim.

**E.   Ms. Donelson's Rehabilitation Act Claim**

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. PHS argues that Ms. Donelson's Rehabilitation Act claim must fail 1) because Ms. Donelson has

1  failed to show that PHS receives federal funding, and 2) because it

2  suffers the same insufficiency of proof that Plaintiff's ADA claim does.

3  **1.    Federal Funding**

4       PHS moves for summary judgment on Ms. Donelson's Rehabilitation Act

5  claim on the ground that Ms. Donelson has not shown that either PHS or

6  SJCC receives federal funding.  In response to PHS's motion, Ms. Donelson

7  submitted a facsimile copy of Defendant's web site which appears to

8  acknowledge that it is "a recipient of Federal financial assistance."

9  Mann Decl., ECF No. 31 Ex. 1 at 1.  PHS responds that this web site is

10 for a "different hospital and it does not specifically mention SJCC." ECF

11 No. 34 at 16.  But PHS is the Defendant in this matter, not SJCC, and Ms.

12 Donelson's exhibit clearly states that "Providence Health & Services –

13 Washington/Montana  Region"  receives  federal  financial  assistance;

14 presumably, Providence Health & Services – Washington/Montana Region

15 includes  Defendant  Providence  Health  &  Services  –  Washington.

16 Accordingly, the Court finds that PHS receives federal funding.

17 **2.    Insufficient Allegations**

18      Because the Rehabilitation Act's language provided a model for the

19 ADA, federal courts apply the same analysis to each.  *See* 42 U.S.C. §

20 12133 ("The remedies, procedures, and rights set forth in [the

21 Rehabilitation Act] shall be the remedies, procedures, and rights

22 [applicable to ADA claims]."); *see also Wong v. Regents of Univ. of*

23 *Calif.*, 192 F.3d 807, 811 n.2 (9th Cir. 1999) ("The ADA and the

24 Rehabilitation Act, as they apply to the parties in this case, create the

25 same rights and obligations.").  The only significant difference between

26 the two acts is the Rehabilitation Act's requirement that the program in

question receive federal financial assistance. *Zukle v. Regents of Univ. of Calif.*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999). Just as with Plaintiff's ADA claim, there are significant factual questions regarding whether SJCC's conduct represented a reasonable accommodation of Ms. Donelson's disability, and the Court thus denies PHS's motion with regard to Ms. Donelson's Rehabilitation Act claim.

**F.   Mr. Donelson's Loss of Consortium Claim**

PHS argues that Plaintiff Douglas Donelson's loss of consortium claim should be dismissed if Plaintiff's other claims are dismissed. While "loss of consortium has been held a separate, independent, nonderivative action of the deprived spouse . . . an element of this cause of action is the 'tort committed against the impaired spouse.'" *Conradt v. Four Star Promotions, Inc.*, 45 Wn. App. 847, 853 (1986). In the context of loss of consortium claims, Washington courts have held that violation of the WLAD is a tort. *See Burchfiel v. Boeing Corp.*, 149 Wn. App. 468, 494 (2009). By analogy, violations of the ADA and/or the Rehabilitation Act would also sound in tort under Washington law. Thus, because several of Ms. Donelson's claims survive, the Court denies PHS's motion in this regard.

**G.   Ms. Donelson's Wrongful Discharge in Violation of Public Policy Claim**

Ms. Donelson initially asserted a state common law claim for wrongful discharge in violation of public policy, but later withdrew this claim in her response to Defendant's Motion for Summary Judgment. ECF No. 29 at 20. Accordingly, PHS's motion is granted in this regard and this claim is dismissed.

### H.    Conclusion

For the foregoing reasons, the Court grants in part, denies in part, and holds in abeyance in part PHS's Motion for Summary Judgment.   The Court holds Defendant's motion in abeyance with regard to Ms. Donelson's WLAD claim, pending briefing on whether it should certify a question to the Washington Supreme Court.   The Court denies PHS's motion with regard to Ms. Donelson's ADA and Rehabilitation Act claims, and with regard to Mr. Donelson's loss of consortium claim.   Finally, the Court grants PHS's motion with regard to Ms. Donelson's wrongful discharge in violation of public policy claim.

## II.  PHS's Motion to Exclude Plaintiffs' Expert Witness Daniel McKinney

PHS moves to exclude the testimony of Plaintiffs' expert witness Daniel McKinney.   Mr. McKinney is a certified vocational rehabilitation counselor who would testify that extending Ms. Donelson's unpaid medical leave was a reasonable accommodation that was available to SJCC.   PHS objects to Mr. McKinney's testimony as 1) irrelevant and not helpful to the jury; 2) stating an impermissible legal conclusion; 3) lacking reliability; and 4) lacking qualification.   The Court addresses the first three of these arguments and does not reach the last.

Federal Rule of Evidence 702 imposes an obligation on the trial judge to screen expert testimony:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to
> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1)
> the testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

ORDER ~ 23

Fed. R. Evid. 702.

Once a proffered expert's testimony is challenged, the district court has a "gatekeeping responsibility" to ensure that the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993).  The Court's gatekeeper role applies not only to scientific testimony, but to all expert testimony. *Kumho Tire Co. Ltd.*, 526 U.S. at 148.  The proponent of the expert has the burden of proving by a preponderance of evidence that the expert's testimony is admissible.  *Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996); *Daubert*, 509 U.S. at 592 n.10.  For the reasons discussed below, the Court grants PHS's motion and excludes Mr. McKinney's expert testimony.

### A.    Relevance and Helpfulness Objections

Ms. Donelson seeks to prove through Mr. McKinney's testimony that an extension of her medical leave was a "reasonable accommodation" that was available to SJCC.  PHS objects to this testimony as both irrelevant and not helpful to the jury.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Fed. R. Evid. 401.  In addition to being relevant, expert testimony must be helpful, that is, it must "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.

Mr. McKinney's testimony would be both relevant and helpful to the jury. Mr. McKinney has worked as a vocational rehabilitation counselor since 1980, and his services include drafting vocational assessments, job analyses, and job development and placement plans. Mr. McKinney's testimony meets the relevance standard in Rule 401 because it would likely make material facts such as Plaintiff's vocational capabilities and job placement options more or less probable than without his testimony. Mr. McKinney's testimony also meets the helpfulness standard in Rule 702 because it would likely assist the jury to understand why disabled individuals' need for medical leave.

**B.   Testimony Regarding Legal Conclusion**

"It is well-established . . . that expert testimony concerning an ultimate issue is not per se improper." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002). Indeed, Rule 704 provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed. R. Evid. 704(a). But an expert witness cannot opine as to her legal conclusion, that is, an opinion on an ultimate issue of law. *See Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1016-17 (9th Cir. 2004). "In other words, an expert may offer his opinion as to facts that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied." *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

Here, Ms. Donelson states that Mr. McKinney will testify "that extending Ms. Donelson's unpaid leave was a *reasonable* accommodation that

1   was available to the defendants." ECF No. 25 at 2 (emphasis added). This

2   is testimony regarding the ultimate issue of law because it parrots the

3   precise language of the WLAD and ADA's cause of action for

4   discrimination. Furthermore, the use of the word "reasonable" signals

5   that Mr. McKinney will testify to an issue that is within the jury's

6   fact-finding duty; the phrase "reasonable accommodation" will undoubtedly

7   appear on the verdict form that is given to the jury at the conclusion

8   of Defendant's case. Accordingly, the Court excludes testimony by Mr.

9   McKinney that relates to whether unpaid medical leave was a reasonable

10  accommodation.

11       **C.   Reliability**

12       PHS also argues that Mr. McKinney's testimony would not be reliable

13  because he has not conducted independent investigation regarding Ms.

14  Donelson's injury, the job description for the NAC position, or SJCC's

15  organization.

16       Federal Rule of Evidence 702 requires that an expert's testimony 1)

17  be based upon sufficient facts or data, 2) be the product of reliable

18  principles and methods, and 3) be based upon an application of the

19  principles and methods to the facts of the case that is "reliable." Fed.

20  R. Evid. 702. *Daubert* set forth several reliability factors which

21  include whether the theory or method is testable, whether the method has

22  been subject to peer review and publication, and whether the method is

23  generally accepted. *Daubert*, 509 U.S. at 593-95. The central focus of

24  *Daubert*'s reliability requirement "is to make certain that an expert,

25  whether basing testimony upon professional studies or personal

26  experience, employs in the courtroom the same level of intellectual rigor

that characterizes the practice of an expert in the relevant field."
*Kumho Tire Co. Ltd.*, 526 U.S. at 152.

Here, Mr. McKinney's deposition testimony illustrates the lack of reliability in the method through which he formed his opinions. In preparation for this matter, Mr. McKinney reviewed only three documents relevant to SJCC: a July 28, 2008 SJCC personnel policy document; a June 10, 2009 email from Linda Flint Childs; and a June 11, 2009 "legal absence determination" from one of SJCC's human resources employees. Mr. McKinney also reviewed the Ninth Circuit's opinion in *Nunes* and select provisions of the Code of Federal Regulations implementing the ADA. Mr. McKinney also apparently conducted one to two hours of online research regarding the ADA using the internet search engine Google.com. Mr. McKinney readily concedes that he has no formal training in the ADA or WLAD or in relevant human resources practices. Because Mr. McKinney has not demonstrated that his opinions were formed after sufficient independent investigation to make them reliable under Rule 702, the Court grants PHS's motion and excludes him from testifying as an expert witness.

## III. Conclusion

For the reasons discussed above, the Court grants in part and denies in part PHS's Motion for Summary Judgment and requires the parties to state their opinions regarding whether the Court should certify the question of the WLAD's religious exemption violates the Washington Constitution to the Washington Supreme Court. The Court grants PHS's Motion to Exclude Plaintiffs' Expert Witness, Daniel McKinney.

Accordingly, **IT IS HEREBY ORDERED:**

1.  Defendant's Motion for Summary Judgment, **ECF No. 18**, is **GRANTED in part** (wrongful discharge claim), **DENIED in part** (ADA, Rehabilitation Act, and loss of consortium claims), and **HELD IN ABEYANCE in part** (WLAD claim).

2.  The parties shall file a notice with the Court regarding their position on whether the Court should certify the question of the WLAD's religious exemption is constitutional **no later than October 28, 2011**. A party that *requests* certification shall include in its memorandum a proposed question for the Court to certify.  A party that *opposes* certification shall file its response to the other party's proposed certified question, if any, **no later than November 4, 2011**.

3.  Defendant's Motion to Exclude Plaintiffs' Expert Witness, Daniel McKinney, **ECF No. 14**, is **GRANTED**.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this Order and provide copies to counsel.

**DATED** this ____14ᵗʰ____ day of October 2011.


                         s/Edward F. Shea
                      EDWARD F. SHEA
                 United States District Judge


Q:\Civil\2010\157.MSJ.lc2.wpd

ORDER ~ 28